## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

In Re:

RAMIN ZAMANI-ZADEH,                            Bankruptcy Case No. 20-11939-t7

      Debtor.

---

TAEKI MARTIN, deceased, and JULIANNE
POTTS-SCHLIMME, Personal Representative
of the Estate of Taeki Martin,

      Plaintiffs/Appellees,

v.                                              U.S. District Court No. 23cv592 DHU/SCY

RAMIN ZAMANI-ZADEH,

      Defendant/Appellant.

## <u>PROPOSED FINDINGS AND RECOMMENDED DISPOSITION</u>

Debtor/Defendant Ramin Zamani-Zadeh is appealing a bankruptcy court order finding

that his judgment debt from an Oregon state court lawsuit is nondischargeable in full. Whether a

debt is nondischargeable turns on whether the underlying judgment arose from actual fraud or

false pretenses. Because the bankruptcy court did not make findings supporting a causal link—

that is, that the entire judgment debt arose from fraud or false pretenses—I recommend that the

Court remand this case to the bankruptcy court for further findings. Further, the bankruptcy court

admitted some evidence that is not admissible for the truth of the matter asserted. Although it is

not clear that the bankruptcy court relied on such evidence for the truth of the matter asserted, to

provide the bankruptcy court guidance on remand, I recommend that the Court address the

parties' arguments regarding admissibility. In sum, I recommend that the Court reverse the bankruptcy court's finding of nondischargeability and remand for further proceedings.[1]

## BACKGROUND

In Oregon state court, on January 29, 2009, Plaintiff Taeki Martin[2] filed a complaint alleging that Defendant Ramin Zamani-Zadeh engaged in financial abuse of a vulnerable person (here, a person over the age of 65) under Oregon Revised Statute §§ 124.100 and 124.110(1)(b), among other claims. *See* Case No. 0901-01452 (Circuit Court for the State of Oregon in the County of Multnomah); Doc. 3 at 25-33.[3]

In the Oregon complaint, Plaintiff alleged that she wanted to enter the restaurant business. Doc. 3 at 26. Defendant told her that he had 17 years of experience in the restaurant industry and solicited funds from her to finance a restaurant. *Id.* Plaintiff mortgaged her house in order to provide funds for the restaurant. *Id.* Plaintiff alleged, "This money was used for the construction costs and capital investment to establish the IBIZA Restaurant in 25 Portland, Oregon." *Id.* Although Defendant did open this restaurant, Plaintiff alleged that he also engaged in various unrelated and unauthorized acts such as buying a boat using a loan in Plaintiff's name without her permission, forging checks from her personal bank account, putting expenses on

---

[1] On July 17, 2023, the Honorable David Urias referred this bankruptcy appeal to me for proposed findings and a recommended disposition under 28 U.S.C. § 636(b). Doc. 2.

[2] Taeki Martin is now deceased. On August 11, 2022, the bankruptcy court entered an agreed order substituting Julianne Potts-Schlimme, in her capacity as Personal Representative of the Estate of Taeki Martin, as Plaintiff in this matter. The opinion below and the parties' briefs continue to use "Plaintiff" to refer to Taeki Martin, and for readability, I will do the same.

[3] All citations in this Report and Recommendation are to the page numbers in the CM ECF headings generated for filings on the district court docket. I do not use the page numbers generated by the bankruptcy court's CM ECF footers at the bottom of the page, or the internal pagination of the parties' briefs.

Plaintiff's credit cards without her permission, and using credit cards in her name for Defendant's personal expenses. *Id.* at 27-29. Further, Plaintiff alleged, Defendant did not make any payments to service the credit cards, other loans in Plaintiff's name, or Plaintiff's mortgage. *Id.* Plaintiff was left in considerable debt. *Id.* at 29.

Defendant answered the complaint, *id.* at 34-35, but failed to appear at trial, Doc. 17 at 10. On May 14, 2010, the state court entered a judgment of $1,001,865.51 in favor of Plaintiff and Zamani Entertainment against Defendant and others under the Abuse of Vulnerable Person statute. Doc. 3 at 37-40. The judgment included $233,955.17 in "economic damages," $100,000 in "non-economic" damages, and it trebled both. *Id.* at 38. The judgment accrues interest at 9% and remains unpaid. *Id.* at 40; Doc. 18 at 9-10.

On October 7, 2020, Defendant filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the District Of New Mexico. Doc. 1, Case No. 20-11939-t7 (Bankr. D.N.M.). In the bankruptcy proceedings, Plaintiff filed a Complaint Objecting to Discharge of Debt, in which Plaintiff argued that Defendant owed her a nondischargeable debt arising from the May 14, 2010 judgment entered by the Oregon state court. Doc. 3 at 7.

On February 19, 2021, the Bankruptcy Court entered a scheduling order with a discovery close date of June 21, 2021. Doc. 3 at 18. On April 26, 2021, Plaintiff filed a motion for summary judgment in which she argued that she could satisfy her burden to establish nondischargeability based on issue preclusion from the Oregon state court. Doc. 3 at 21, 41-49. After the close of discovery, on August 12, 2021, the bankruptcy court denied Plaintiff's summary judgment motion, ruling that issue preclusion did not apply. Doc. 3 at 99. The bankruptcy court reasoned that the question of nondischargeability turned on fraud, and fraud was not raised, actually litigated, or essential to the state court judgment. *Id.* at 109-10.

The bankruptcy court therefore tried the issue of nondischargeability on October 25, 2022 and March 2, 2023. Doc. 5 at 148. On May 11, 2023, the bankruptcy court entered an opinion finding that the entire Oregon state court judgment is nondischargeable under Section 523(a)(2)(A), which prohibits the discharge of a debt "for money . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud." Doc. 5 at 148-59.

The bankruptcy court described the record before it as follows:

> The trial record is somewhat sparse. Plaintiff did not call a witness or introduce documentary evidence in support of her case. Instead, she relied on the complaint, answer, judgment, her 2010 testimony in the state court action, and the cross-examination of Defendant in this proceeding. This evidence, together with Defendant's direct examination testimony, Debtor's trial exhibits, the testimony of Defendant's former Oregon liquor license attorney, and Defendant's admissions in his answer to the complaint, comprise the trial record.

*Id.* at 153. As the bankruptcy court further explained, after trial it admitted the Oregon state court complaint, answer, judgment, and Plaintiff's 2010 Oregon trial testimony into evidence. *Id*. at 153 n.8. In so doing, however, the bankruptcy court did not indicate whether it admitted the state court complaint, answer, and judgment for evidence of the truth of the matters asserted in those documents.

The bankruptcy court set forth all relevant factual findings in its May 11 opinion as a narrative discussion unaccompanied by any citations to the record. Because the sufficiency of these findings is the primary issue in this appeal, I will quote them in full:

> In 2008, Defendant Ramin Zamani-Zadeh had 12 years of restaurant experience and 8 years of construction experience. He was in an Oregon prison, serving a sentence for bank fraud. While in prison he met Steve Martin, who was serving a sentence for drug dealing. Defendant told Martin he wanted to start a restaurant after he got out. Defendant and Martin discussed a funding source for the venture. Martin told Defendant that Martin's mother, Plaintiff Taeki Martin, might be willing to invest in the business. At some point, Martin suggested to his mother that she mortgage her house in the Seattle, Washington area to raise money and invest the proceeds in Defendant's restaurant venture. The house, which Plaintiff owned free and clear, was her only substantial asset.

When Defendant got out of prison he met with Plaintiff at her house. Martin was still in jail. Defendant and Plaintiff agreed they would go into the restaurant business together. In general terms, Plaintiff agreed to invest one half of the money needed for the restaurant venture and Defendant would supply the other half. Defendant formed Zamani Entertainment LLC, a Washington limited liability company ("Zamani Entertainment"), in March 2008 to own and operate the restaurant. The evidence is unclear whether Plaintiff was to own half of the LLC or just 25%.

Plaintiff mortgaged her house and obtained proceeds of $194,644.18, which she deposited into a newly opened Zamani Entertainment account at US Bank. The only other capital contribution was a loan for $80,000 from the Defendant's parents.

Defendant contacted brokers and looked for a restaurant location in Seattle. Plaintiff and Defendant looked at several Seattle locations and were interested in one, but did not sign a lease. Defendant and Plaintiff then began looking for a location in Portland, Oregon. Eventually they found a building that formerly was operated as the House of Gold restaurant.

Obtaining a liquor license was essential to Defendant's business plan. However, under Oregon law, liquor licenses cannot be issued to businesses owned by convicted felons. Because of that, even though Defendant was a co-owner of Zamani Entertainment, he was never listed as an owner. Instead, Defendant's father was put on the books as an owner. Similarly, Plaintiff wanted her son Martin to be an owner of the restaurant, so he would have a useful occupation after he got out of jail. However, because of his criminal conviction, he was never shown as an owner.

At some point in the spring or early summer of 2008, Martin was released from prison and sent to a halfway house in the Seattle area. Martin slept at the halfway house but was able to go to Portland on the weekends. Contrary to his mother's hopes and wishes, Martin continued to associate with the same, or same type, of people he associated with before he went to prison. Defendant described it as a drug-dealing lifestyle.

In May 2008, Defendant and Martin bought a boat, using $6,104 from the Zamani Entertainment bank account and a loan for $21,099 obtained in Plaintiff's name. There are pictures of Martin, Defendant, and unknown women "partying" in the boat.

By forging Plaintiff's signature on the application, Defendant got an American Express credit card for the business. Using the card, Defendant or Martin bought clothing, expensive dinners, and trips for Martin.

In June 2008, Defendant caused Zamani Entertainment to buy a "limousine" for $75,000. He bought the limousine to take restaurant customers home if they had

had too much to drink. In October 2008, Defendant caused Zamani Entertainment to pay an additional $77,396 for limousine repairs and expenses. The expenses were paid with checks made out to cash and a Zamani Entertainment debit card. Martin had access to the debit card.

Martin had possession of or access to Zamani Entertainment credit cards, and also to credit cards in Plaintiff's name that Defendant had obtained. The credit cards were issued by Bank of America, Washington Mutual, Bank of the West, and American Express. Defendant obtained the cards. It is not clear how much Plaintiff knew about or was involved in opening the credit card accounts, all of which were in her or Zamani Entertainment's name. Martin charged about $30,000 on the Bank of the West card.

Plaintiff never was aware of, or authorized, Martin or Defendant to use her personal or the business credit cards for non-business expenses. Plaintiff thought the American Express card was in Defendant's name and did not know Martin had access to it.

The lease for the former House of Gold building was signed on June 25, 2008. The space was remodeled between June and September 2008. The remodeled premises featured a restaurant downstairs and a nightclub upstairs.

In July 2008 Defendant, through an attorney, drafted an LLC interest purchase agreement (["]the Purchase Agreement") that obligated Plaintiff to pay $480,000 for 75% of Zamani Entertainment. [Footnote 5 text: An operating agreement for Zamani Entertainment listed Defendant's father as owning 75% of the LLC and Plaintiff as owning the other 25%.] Defendant convinced Plaintiff to sign the Purchase Agreement. Plaintiff was persuaded that she would be able to make the required payments from her restaurant profits.

The restaurant, named Ibiza, opened in September 2008. While the restaurant was open, it made very little profit, although it was able to generate enough cash to pay its rent, labor, food and beverage costs, and similar expenses. One problem Ibiza had was that Martin would come to the restaurant when he could get away from the halfway house and "drink the profits."

In December 2008, Defendant issued a default letter to Plaintiff stating that her interest in Zamani Entertainment had been forfeited because of her default under the Purchase Agreement. Plaintiff did not know until much later that Defendant tried to forfeit her interest in Zamani Entertainment. Plaintiff did not recall getting a notice of default, and was only made aware of it after the fact by her lawyer.

Ibiza closed on January 30, 2009. Plaintiff never received any money from the restaurant. The liquor license granted to Ibiza was temporary and was not renewed after it expired in January 2009.

Doc. 5 at 149-52.

Based on these facts, the bankruptcy court found that Defendant was "not an honest businessman" and the restaurant was not "a legitimate operation that failed for reasons beyond [Defendant's] control." *Id.* at 155-57. Instead, "Defendant introduced himself to Plaintiff and hit upon a scheme to separate her from her net worth." *Id.* at 157. "Knowing the restaurant venture was doomed . . . [Defendant] stuck with his fraudulent scheme until the money ran out, the temporary liquor license expired, and Plaintiff's lawyer came after him. When things got too hot, Defendant lit a shuck for Tucumcari, New Mexico." *Id.*

The court then addressed causation. *Id.* at 158. Acknowledging that "[t]he nondischargeable debt is the amount of damages arising from the non-dischargeable conduct," it said:

> Having ruled that Defendant defrauded Plaintiff, the Court must determine what damages arose from the fraud.
>
> Plaintiff's state court complaint includes allegations of conversion, breach of duty, forgery, fraud, violation of state corporate governance laws, and embezzlement. Based on the complaint alone, it would be difficult to assign damages to the various alleged wrongful acts.
>
> The state court judgment, however, is another story. The sole wrongful act mentioned in the judgment as the cause of Plaintiff's damages is fraud.

*Id.* Based on this language in the Oregon judgment, the bankruptcy court concluded "that all the damages awarded in the state court judgment arose from Defendant's nondischargeable conduct, i.e., fraud. The damages are nondischargeable under § 523(a)(2)(A)." *Id.* at 159.

Defendant filed a motion to reconsider, which the bankruptcy court denied on June 30, 2023. *Id.* at 173-84. This appeal followed.

## **STANDARD OF REVIEW**

Federal district courts have jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy courts pursuant to 28 U.S.C. § 158(a). The district court reviews the

bankruptcy court's legal determinations de novo and its factual findings for clear error. *In re Hedged-Investments Assocs., Inc.*, 84 F.3d 1267, 1268 (10th Cir. 1996).

## **DISCUSSION**

Defendant argues that the bankruptcy court failed to find a causal link between the judgment debt and Defendant's fraudulent conduct with respect to both Plaintiff's economic and non-economic damages. I agree. The bankruptcy court did not make its own finding as to causation, but deferred to the Oregon state judgment—despite having earlier refused to give preclusive effect to the judgment. This was error, because the bankruptcy court needed to either make a preponderance of the evidence finding as to nondischargeability or rely on collateral estoppel. It did neither.

In addition to the issue of causation, remand is necessary to provide the bankruptcy court the opportunity to determine if Plaintiff offered evidence of non-economic damages and, if she did, to determine the extent to which those damages arose from fraud or false pretenses in which Defendant engaged. Remand is also necessary as to economic damages because the bankruptcy court decision did not link specific acts of fraud to the judgment debt or cite sufficient evidence of fraudulent conduct or false pretenses to support an overarching scheme to defraud.

To provide the bankruptcy court guidance on remand, the Court should also resolve the two evidentiary issues the parties have briefed. First, the bankruptcy court admitted the state court complaint into evidence. Defendant argues that, even though unsworn allegations in a complaint are not properly admitted for the truth of the matter asserted, the bankruptcy court relied on such allegations in making its factual findings. Because the bankruptcy court did not indicate the source of its factual findings, the Court cannot determine whether Defendant is correct. Because the Court cannot determine whether the bankruptcy relied on unsworn,

unadmitted allegations in the complaint to form its factual findings, this Court should simply make clear on remand that allegations in Plaintiff's state court complaint cannot be admitted for the truth of the matter asserted (unless Defendant admitted the allegations or other evidence supports them).

Second, the bankruptcy court admitted Plaintiff's sworn testimony in the Oregon state case. Because Plaintiff was unavailable during the bankruptcy trial, her prior Oregon state testimony was admissible during the bankruptcy trial. Statements Plaintiff's counsel made during the Oregon state trial, however, are not admissible unless those statements were adopted by Plaintiff. Again, because the bankruptcy court did not provide citations to its factual findings, the record does not indicate whether the bankruptcy court relied on inadmissible statements from Plaintiff's counsel to form the factual basis of its findings. Therefore, this Court should make clear on remand that Plaintiff's prior state court testimony, to include Plaintiff's adoption of her counsel's leading questions, is generally admissible. The Court should clarify, however, that statements Plaintiff's counsel made are not admissible unless Plaintiff adopted those statements.

## I.    The bankruptcy court did not make sufficient findings to support nondischargeability of the entire debt.

Defendant argues the bankruptcy court's findings do not support the conclusion that the entirety of his judgment debt is nondischargeable. Resolution of this issue is fairly straightforward with regard to non-economic damages—the bankruptcy court record, which includes the state court record, does not appear to contain any evidence of non-economic damages, much less evidence that such damages are connected to fraud or false pretenses in which Defendant engaged. Therefore, remand is necessary for the bankruptcy court to address whether admissible evidence establishes a causal link between Defendant's conduct and any emotional (non-economic) damages Plaintiff proved she suffered.

The failure to find causation also necessitates remand with respect to Defendant's challenge to the bankruptcy's finding of nondischargeability of Plaintiff's economic damages. The bankruptcy court failed to find the elements of the statute were satisfied either by a preponderance of the evidence or due to collateral estoppel. I also recommend the Court address whether the bankruptcy court's factual findings would be sufficient to affirm the decision below, even absent an explicit finding of causation by the bankruptcy court. Although the bankruptcy court does recite factual support for some specific instances of fraud that are clearly and obviously linked to the judgment debt, it did not link specific acts of fraud to any specific portion of the judgment debt. Further, it did not cite sufficient evidence of fraudulent conduct or false pretenses to support an overarching scheme to defraud in which all of the judgment debt can be said to arise from such an overarching fraudulent scheme.

> As applied to both non-economic and economic damages, Defendant contends:
>
> The Bankruptcy Court did not sufficiently explain how Mr. Zamani's conduct fell within the context of Section 523(a)(2)(A), and does not identify which of the three types of fraud Mr. Zamani's conduct met. Instead of identifying which type of fraud Mr. Zamani committed, the Bankruptcy Court engaged in a cursory review of the evidence denouncing Mr. Zamani's conduct generally. [3 RP 568-569] Some of the Bankruptcy Court's factual findings evidence conduct that does not fall under Section 523(a)(2)(A).
>
> Instead of express findings regarding how Mr. Ramani's conduct met each element, the Bankruptcy Court describes all the ways in which Defendant is "not an honest business man." In many instances, "honest" should be replaced with "competent." . . . [T]he Bankruptcy Court apparently assumed that Mr. Zamani had the responsibility of giving Plaintiff proficient business advice.

Doc. 17 at 29-30. As an initial matter, I disagree with Defendant's assertion that the bankruptcy court did not "identify which of the three types of fraud" Defendant's conduct met. The bankruptcy court found that Defendant's conduct qualified as false pretenses and/or actual fraud. Doc. 5 at 157 ("The Court finds and concludes that Defendant acted under false pretenses with

respect to, and/or committed actual fraud against, Plaintiff, within the meaning of

§ 523(a)(2)(A).").

I agree, however, with Defendant's assertion that the bankruptcy court's legal

conclusions as to fraud or false pretenses lack support in the bankruptcy court's factual findings.

"False pretenses" requires that the debtor knowingly acted in a way as to create a false

impression in the mind of the plaintiff—either by an implied misrepresentation, a material

omission, or other conduct such as an insinuation or inference about the transaction at issue. *In re*

*Sturgeon*, 496 B.R. 215, 223 (B.A.P. 10th Cir. 2013). "Actual fraud" covers "any deceit, artifice,

trick or design involving direct and active operation of the mind, used to circumvent and cheat

another." *In re Vickery*, 488 B.R. 680, 686 (B.A.P. 10th Cir. 2013); *see In re Thompson*, 555

B.R. 1, 12 (B.A.P. 10th Cir. 2016) (actual fraud is "wrongful intent and conduct sufficiently

imbued by deception or trickery to deprive or cheat another of property or a legal right"). In

addition, as stated above, the statute requires a causal connection between the actual fraud or

false pretenses, and the money the debtor obtained. In considering whether evidence supports a

finding that Defendant's judgment debt arose from fraudulent conduct, I first consider

Defendant's judgment debt based on non-economic damages, and then turn to the question of

economic damages.

A.    <u>Judgment debt based on non-economic damages</u>

Defendant argues the bankruptcy court failed to make findings establishing the basis for

the award of non-economic damages (emotional distress) in the Oregon judgment and to connect

such damages to fraud or false pretenses. The Oregon judgment awarded $100,000 in emotional

distress damages and trebled them to $300,000. Doc. 3 at 90. The bankruptcy court found this

portion of the judgment to be nondischargeable. Doc. 5 at 158-59. Defendant points out,

however, that the bankruptcy court did so despite acknowledging that "non-economic damages

were not sought in the [Oregon] complaint." Doc. 17 at 32; Doc. 3 at 101. Defendant further

asserts Plaintiff never provided evidence of emotional distress damages, making it impossible for

the bankruptcy court to connect any fraud or fraudulent conduct in which he engaged to such

damages. Doc. 17 at 32-34.

Such a connection is crucial because the question of nondischargeability turns on whether

the underlying judgment sounds in fraud. The bankruptcy code prohibits the discharge of a debt

"for money . . . to the extent obtained by . . . false pretenses, a false representation, or actual

fraud." 11 U.S.C. § 523(a)(2)(A). All three statutory predicates contain a causation requirement;

that is, the person seeking a discharge must have "obtained" "money" "by" committing this

fraud. 11 U.S.C. § 523(a)(2)(A); *see In re Thompson*, 555 B.R. 1, 12 (B.A.P. 10th Cir. 2016);

*Field v. Mans*, 516 U.S. 59, 66 (1995) (describing this "obtained by" statutory language as a

"causation" requirement). The creditor has the burden to prove, by a preponderance of the

evidence, the elements of a § 523(a) claim. *Grogan v. Garner*, 498 U.S. 279 (1991) (proponent

of nondischargeability bears the burden of establishing nondischargeability by preponderance of

the evidence, but may alternatively satisfy this burden via collateral estoppel).

The bankruptcy court acknowledged that only "the amount of damages arising from the

non-dischargeable conduct" is nondischargeable. *Id.* at 158 (citing *Cohen v. de la Cruz*, 523 U.S.

213, 215 (1998)). "The inquiry is one of causation. If the damages would not have been awarded

but for the fraud, they are nondischargeable." *Id.* (citation omitted). Defendant agrees with this

legal principle, but argues Plaintiff failed to satisfy her burden to show causation by

preponderance of the evidence and that the bankruptcy court explicitly rejected using the state

court judgment to establish such causation via collateral estoppel. Doc. 17 at 27-32.

In response, Plaintiff argues that, in *Cohen*, the Supreme Court "reasoned that a debtor's obligation is not limited to reimbursement of value received, but requires him to make his victim whole. As such, once it is shown that any part of the award represents the disgorgement of funds obtained by fraud, then those other damages that comprise the award, so long as they arise from that fraudulent conduct, are nondischargeable." Doc. 18 at 26 (citing 523 U.S. at 213). As it applies to emotional distress, Plaintiff's argument is that even though her emotional distress never translated to money in Defendant's pocket, damages for emotional distress that comprise part of Defendant's judgment debt are nondischargeable as long as that judgment debt arose from Defendant obtaining value from fraudulent conduct. Although I disagree with how Plaintiff applies *Cohen* to the facts of this case, I agree with Plaintiff's summary of *Cohen*'s holding.

In *Cohen*, the United States Supreme Court held that treble damages "awarded on account of the debtor's fraud fall within the scope of the [Section 523] exception." 523 U.S. at 213. "[T]he exception encompasses 'any debt for money, property, etc., to the extent that the money, property, etc., is obtained by' fraud. The phrase thereby makes clear that the share of money, property, etc., so obtained gives rise to a nondischargeable debt. Once it is established that specific money or property has been obtained by fraud, however, 'any debt' arising therefrom is excepted from discharge." *Id.* at 213-14 (alterations omitted). *Cohen*, however, did not dispense with the statutory requirement that such damages must be "obtained by," i.e., causally connected to, "false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A).

Applying *Cohen* here translates to this two-step analysis: (1) if it has been established that Defendant obtained money by fraud, then (2) any and all Defendant's judgment debt "arising therefrom" is nondischargeable, including treble damages provided for by state law.

13

Thus, if Defendant obtained any money by fraud, a judgment for emotional damages that arose from Defendant's fraudulent conduct, to include the treble multiplier of such damages, is nondischargeable. Because the bankruptcy court found that Defendant obtained at least some money by fraud, all Plaintiff's damages, including non-economic damages, that "arose therefrom" would be nondischargeable.

Defendant acknowledges that *Cohen* would apply and make the Oregon court's judgment for emotional damages nondischargeable if there were evidence that any emotional distress damages Plaintiff suffered arose from fraud. Doc. 17 at 28-29. But, Defendant contends, Plaintiff presented no evidence, either in the Oregon trial or the bankruptcy trial, that her emotional distress damages "arose" from Defendant obtaining money by fraud. *Id.* Indeed, Defendant asserts, Plaintiff did not even ask for emotional distress damages in the Oregon case. *Id.* at 32. Although Plaintiff responds that Oregon law does not condition recovery of such damages on a specific request for them in the complaint, Doc. 18 at 25, Plaintiff points to no testimony or other evidence in either proceeding establishing that she suffered from emotional distress as a result of fraud.[4] Nor did the bankruptcy court make its own findings about the basis of Plaintiff's emotional distress or its own finding that Plaintiff suffered emotional distress. Thus, the bankruptcy court decision failed to set forth facts that support a finding that Plaintiff suffered emotional distress, that Defendant's fraudulent conduct caused this emotional distress, or, if it did, the extent of this emotional distress.

---

[4] Plaintiff's brief on appeal asserts that, "In the Oregon case, Plaintiff made a record of the emotional distress she suffered as a result of Defendant's fraud," Doc. 18 at 27, but cites no record evidence or other facts in support of this assertion. I have not found reference to such facts elsewhere. I therefore do not accept this unsupported assertion.

Granted, although the bankruptcy court did not focus on emotional distress damages, it did analyze potential sources of support for its conclusion that all of Defendant's judgment debt is causally connected to fraud or false pretenses. It began with the Oregon state court complaint and acknowledged that this document is insufficient. Doc. 5 at 158 ("Based on the complaint alone, it would be difficult to assign damages to the various alleged wrongful acts."). But then the bankruptcy court went on to explain: "The state court judgment, however, is another story. The sole wrongful act mentioned in the judgment as the cause of Plaintiff's damages is fraud." *Id.* On this basis alone, the bankruptcy court "conclude[d] that all the damages awarded in the state court judgment arose from Defendant's nondischargeable conduct, i.e., fraud." *Id.* at 159. Thus, the bankruptcy court concluded that the Oregon judgment alone supports a holding that Plaintiff's mounting debts, emotional distress, and treble damages all arose from fraud. Rather than conducting an independent assessment of the Oregon state court's findings, that is, the bankruptcy court simply deferred to the Oregon state court's findings.

As Defendant points out, in deferring to the Oregon state court's findings without conducting an independent analysis, it appears the bankruptcy court, for all practical purposes, applied the doctrine of issue preclusion. Doc. 17 at 27. If the bankruptcy court determined that issue preclusion applies, this would not be a problem. As noted above, in *Grogan*, the Supreme Court recognized that a creditor may satisfy its nondischargeability burden by showing issue preclusion applies through the principles of collateral estoppel. 498 U.S. at 284-85.

The Oregon state court judgment includes the finding that "Defendants are liable for violations of the prohibitions on financial elder abuse as provided by ORS 124.100 by way of the Defendants and each of them having engaged in a scheme designed to deprive the Plaintiffs of money through artifice, false pretenses, and fraud which were established clearly and

convincingly [sic]." Doc. 3 at 37-38. Armed with these findings, Plaintiff filed a motion for

summary judgment based on issue preclusion. The bankruptcy court, however, denied Plaintiff's

motion. It explained:

> The only tort pled in Plaintiff's state court complaint, conversion, was not
> mentioned in the Judgment. Plaintiff did not plead any kind of fraud (e.g., false
> pretenses, false representation, or actual fraud). The state court made no findings
> that would support the legal conclusion that Defendant had defrauded Plaintiff.
> Instead, the Judgment includes the "finding" that Defendant "engaged in a scheme
> designed to deprive the Plaintiffs of money through artifice, false pretenses, and
> fraud . . . ." The Judgment apparently was drafted by Plaintiff's counsel and
> signed without alteration by the state court. This conclusory "finding," based on
> unknown evidence, does not establish an identity of issues between the State
> Court Action and Plaintiff's § 523(a)(2)(A) claim.

Doc. 3 at 109.[5] Thus, the bankruptcy court held that it is not clear from the Oregon judgment that

the issue of fraud was actually litigated and was essential to a final decision on the merits in the

prior proceeding. As part of this holding, the bankruptcy court concluded that the Oregon state

court findings failed to support Plaintiff's argument that Defendant's current debt arises from

fraud.

Thus, in the present case, the bankruptcy court found that the Oregon judgment *should*

*not* be given preclusive effect. And Plaintiff has not challenged this finding on appeal.[6] The

---

[5] Almost two years after noting that Plaintiff did not plead any kind of fraud and that the state
court made no factual findings that would support the legal conclusion that Defendant had
defrauded Plaintiff, the bankruptcy court wrote in its opinion on the merits: "Plaintiff's state
court complaint includes allegations of . . . fraud . . . ." Doc. 5 at 158. Both the statement about
not pleading fraud and the statement about including allegations of fraud are correct. Plaintiff's
state court complaint used the word "fraud" in its introduction but did not plead fraud as a cause
of action. Doc. 3 at 26, 29-32.

[6] In passing, Plaintiff maintains her position that collateral estoppel should apply based on the
Oregon litigation. Doc. 18 at 21 n.5. But Plaintiff did not file a cross-appeal as to this issue, and
the conclusory footnote is insufficient to brief a full challenge to this finding on appeal. I
recommend the Court decline to review whether the bankruptcy court erred in ruling on issue
preclusion.

bankruptcy court, having found that preclusive effect is not warranted, did not supply any other basis for deferring to the Oregon judgment. Further, neither Plaintiff nor the bankruptcy court provides a theory under which the judgment itself is admissible evidence of the truth of the matter asserted. It therefore appears the bankruptcy court erred in relying on the Oregon state court judgment to connect all of Plaintiff's damages to fraud or false pretenses.

Because Plaintiff does not presently challenge the bankruptcy court's ruling on issue preclusion, she does not argue that the Court should look to the judgment in the Oregon state court case as evidence of fraud. Instead, she argues that the bankruptcy "court arrived at the conclusion that the debt was nondischargeable independently [from the findings in the state court judgment]." Doc. 18 at 21. Plaintiff then cites numerous portions of Defendant's testimony at the bankruptcy trial which she argues provide examples of independent support for the bankruptcy court's findings. None of the examples, however, relate to her emotional distress. Doc. 18 at 22-24 (citing, for example, "Defendant's testimony that he purchased a boat that was titled in his own name with Zamani Entertainment money and with a loan in Plaintiff's name"; testimony that "Defendant transferred over $150,000 money out of Zamani Entertainment's account" and spent the money at local restaurants, Ikea, and a women's lingerie website, among other things; and "Defendant admitted under oath that he used Ms. Martin's American Express to go to Las Vegas").

Further, even if the bankruptcy court did not rely on the Oregon state court judgment to conclude that Defendant's conduct qualified as false pretenses or actual fraud, the bankruptcy court explicitly relied on the Oregon state court findings to establish causation as to the entire judgment debt, including emotional distress. Doc. 5 at 158-59 (citations omitted). I agree with Defendant that the bankruptcy court's reliance on the state court judgment to establish a causal

connection between Defendant's entire judgment debt and Defendant's fraudulent conduct was error because, absent collateral estoppel, the judgment claimant must show nondischargeability by preponderance of the evidence. *Grogan*, 498 U.S. at 284-85, 290. Put simply, Plaintiff cites no evidence supporting the conclusion that her emotional distress damages arose out of Defendant's fraud, let alone evidence that could support a preponderance finding.

      B.    <u>Judgment debt based on economic damages</u>

As set forth above, the bankruptcy court erred in relying on the Oregon judgment to establish a connection between Defendant's judgment debt and fraud. This error applies to both non-economic and economic damages. That is, with the bankruptcy court's removal of collateral estoppel from the picture, Defendant's judgment debt based on economic damages is only nondischargeable if Plaintiff proved by a preponderance of the evidence that such debt arose from Defendant's fraudulent conduct. The bankruptcy court did not make an explicit causation finding based on a preponderance of the evidence. Nonetheless, I recommend the Court consider whether the bankruptcy court's findings are sufficient to support such a conclusion even in the absence of an explicit finding.

In reaching its nondischargeability holding, the bankruptcy court first considered specific conduct in which Defendant engaged. It discussed Defendant's acts of using restaurant investment funds on purchases unrelated to the restaurant, forging Plaintiff's signature, obtaining loans in Plaintiff's name without her permission, and charging personal expenses to credit cards in Plaintiff's name. Doc. 5 at 150-51. To the extent Defendant's judgment debt arose from these specific acts of fraudulent conduct, such facts would support a finding that the debt is nondischargeable. As set forth below, however, the bankruptcy court did not link any of these actions to a particular portion of the judgment debt. Although the specific conduct the bankruptcy court references would support a holding that at least some of the judgment debt is

nondischargeable, it does not support a holding that the entire judgment debt is nondischargeable.

The bankruptcy court concluded its analysis by making general remarks about Defendant's "scheme" to defraud Plaintiff of her net worth by convincing her to invest in a business that was "doomed to fail." *Id.* at 157. Although a supportable causation finding as to all of Defendant's judgment debt might flow from an overarching scheme to create the false appearance of a genuine restaurant venture as a means to dupe Plaintiff into continually funding this fraudulent venture, the current record does not support the existence of a such an overarching fraudulent scheme.

I will begin my analysis of economic damages by first looking to evidence of specific conduct in which Defendant engaged and the extent to which evidence supports a finding that Defendant's judgment debt arises from such specific conduct. Next, I will consider whether admissible evidence the bankruptcy court referenced supports a finding that Defendant perpetrated an overarching scheme to defraud that gave rise to Plaintiff's entire judgment debt based on economic damages.

## 1. Specific conduct

The bankruptcy court found, as a general matter: "Defendant is not an honest businessman. He is dishonest and scheming." Doc. 5 at 157. Leading into this finding, the bankruptcy court provided numerous examples of conduct it found inconsistent with that of an honest businessman. Some of the bankruptcy court's examples clearly set forth conduct that sounds in actual fraud or false pretenses. For example, the bankruptcy court stated:

- [An honest businessman] would not falsify corporate documents to hide his ownership of the restaurant, in an effort to defraud the Oregon liquor license authority.

- An honest businessman would not forge his partner's signature twice.

Doc. 5 at 156. And, as Plaintiff's brief highlights, the bankruptcy court did make some factual findings related to Defendant's conduct. Doc. 18 at 22-24. For instance, Defendant's act of using Plaintiff's money to buy a boat that has no arguable connection to the restaurant sounds in fraud. Doc. 5 at 150. Therefore, I agree with Plaintiff that the bankruptcy court did set forth facts that provide a causal connection between some fraudulent conduct in which Defendant engaged and some of the judgment debt. Doc. 5 at 150-51, 156.

The bankruptcy court, however, did not then take the next necessary step of calculating what portion of the judgment debt arises from such conduct. To the extent Plaintiff invested money with Defendant to open a restaurant and that money was actually used to open and operate a restaurant, such a fact does not support a conclusion that Plaintiff's loss of that money was caused by Defendant's fraud.[7] That such a fact might be consistent with a finding that the judgment debt arose from the state tort of financial elder abuse, which does not require intentional trickery or deception to be proven as an element, Or. Rev. Stat. § 124.110(1)(a), is insufficient for purposes of § 523.

Further, the bankruptcy court decision seemed to assume that the conduct of Steve Martin (Plaintiff's son) constitutes fraud committed by Defendant. *E.g.*, Doc. 5 at 156 (part of the finding of nondischargeability is that Defendant "allowed" Martin to waste Plaintiff's money). But allowing Martin to waste Plaintiff's money, without more, does not meet the legal elements

---

[7] Using money to fund a restaurant could be part of a fraudulent scheme if, for instance, those expenditures and the operation of the restaurant were used to create an appearance of legitimacy as a means to convince Plaintiff to continue to provide funds for the restaurant. The bankruptcy court, however, does not make factual findings to support such a theory. Instead, the bankruptcy court found that Defendant actually opened a restaurant and that he did indeed operate it as a restaurant and bring in enough money to cover its own expenses. Doc. 5 at 149-51.

of fraud or false pretenses. Nor did the bankruptcy court find that Defendant should be liable for Steve Martin's actions through conspiracy, agency, or some other theory.

Attributing Martin's fraud or false pretenses to Defendant is additionally problematic given the bankruptcy court's factual findings that Martin was the one who convinced Plaintiff to mortgage her house and then wrongfully used much of Plaintiff's money. Doc. 5 at 149 (Martin suggested Plaintiff mortgage her home in order to enter the restaurant business with Defendant); *id.* at 150 ("By forging Plaintiff's signature on the application, Defendant got an American Express credit card for the business. Using the card, Defendant *or* Martin bought clothing, expensive dinners, and trips for Martin." (emphasis added)); *id.* at 151 ("Martin charged about $30,000 on [Plaintiff's credit] card."); *id.* (the restaurant was not profitable in part because Martin drank there for free when he could get away from the halfway house).

As another example, Defendant and Martin's act of purchasing and repairing a limousine is not *necessarily* fraudulent if, as Defendant apparently testified, this was done for the purpose of transporting customers of the restaurant. And the bankruptcy court did not discredit Defendant's testimony about the purpose of the limousine; instead, it adopted his representation in its findings of fact. Doc. 5 at 150 ("He bought the limousine to take restaurant customers home if they had had too much to drink."). The bankruptcy court did not make further findings as to why this was a fraudulent use of restaurant funds.

Thus, to the extent the bankruptcy court uses such specific acts of purported fraudulent conduct to establish a causal connection to the economic damages in the Oregon judgment on remand, I recommend the Court rule that it must both explain why Martin's conduct is attributable to Defendant, and perform a causal analysis to link this conduct with the judgment debt.

2.    Scheme or artifice

Linking instances of specific fraudulent conduct and specific portions of the judgment, however, may not be necessary where evidence establishes that Defendant perpetrated a scheme or artifice to part Plaintiff from her money by trickery, and all of the judgment debt arose from that scheme. *Cf. Cohen*, 523 U.S. at 213-14. The bankruptcy court concluded that Defendant acted with the intention of separating Plaintiff from her net worth by running a business that was doomed. Doc. 5 at 157. But as Defendant asserts, much of his conduct that the bankruptcy court characterizes as dishonest would be more accurately characterized as incompetent. Doc. 17 at 30. For instance, the bankruptcy court said:

- An honest businessman would have had a budget for capital expenses that would have allowed the restaurant to open, fully equipped and staffed, with sufficient capital to operate.

- Honest people don't go into business with unreformed drug dealers.

- Knowing that Plaintiff had mortgaged her house to raise the investment capital, an honest businessman would have ensured that she had funds available to service the mortgage.

- [A]n honest businessman . . . would have never allowed Plaintiff to invest her life savings in his risky start-up venture.

Doc. 17 at 30 (quoting Doc. 5 at 156-57). On the surface, such conduct is not fraudulent as it does not appear to be part of an intentional scheme to trick Plaintiff, but merely constitutes negligence (or the tort of elder abuse).

In her brief, Plaintiff argues:

Defendant was savvy enough to hire an attorney to draft a purchase agreement that required Plaintiff to pay him large sums of money for a business in which Plaintiff was the majority investor, and then to take steps to foreclose upon that agreement when payments were not made. That behavior is not incompetent, it is calculated.

Doc. 18 at 26.

It is true that these steps to remove Plaintiff from her own business could constitute a calculated scheme to trick her out of all of her money and therefore provide support for a link between the scheme and all of the judgment debt. And the bankruptcy court did make findings regarding some of the basic facts of this theory:

- "In July 2008 Defendant, through an attorney, drafted an LLC interest purchase agreement (the Purchase Agreement") that obligated Plaintiff to pay $480,000 for 75% of Zamani Entertainment. Defendant convinced Plaintiff to sign the Purchase Agreement. Plaintiff was persuaded that she would be able to make the required payments from her restaurant profits." Doc. 5 at 151.

- "In December 2008, Defendant issued a default letter to Plaintiff stating that her interest in Zamani Entertainment had been forfeited because of her default under the Purchase Agreement." Doc. 5 at 152.

- "An honest businessman would never had prepared the Purchase Agreement, nor valued his interest in the start-up at $480,000, nor cajoled Plaintiff into signing it, and would never have attempted to take Plaintiff's share of the restaurant away from her on the pretext of a default under the Purchase Agreement." Doc. 5 at 157.

However, the bankruptcy court did not actually adopt the theory that this was a calculated scheme to freeze Plaintiff out of the business. It did not explain why $480,000 was not a fair valuation of what Plaintiff was purchasing; the basis for the finding that Defendant intended to trick or deceive Plaintiff by "cajoling" her into signing; or whether Defendant knew or intended for Plaintiff to be unable to make payments on this agreement. And, again, the bankruptcy court did not find that any facts in the record supported causation between these acts and the judgment debt. Doc. 5 at 158.

The bankruptcy court concluded instead that it was Defendant's scheme to take Plaintiff's money, spend her money on a failing business until it ran out, and then disappear: "With Martin's help, Defendant introduced himself to Plaintiff and hit upon a scheme to separate her from her net worth . . . . Knowing the restaurant venture was doomed for the reasons discussed above, [Defendant] stuck with his fraudulent scheme until the money ran out." Doc. 5 at 157.

Defendant's actions in the bullet points cited above do not provide evidentiary support for an intentional scheme to pretend to run a legitimate restaurant venture as a means to entice Plaintiff to invest money into the fraudulent venture.

Nor did the bankruptcy court supply any other evidentiary justification for this conclusion. It stated:

> The Court finds and concludes that Defendant is not an honest businessman. He is dishonest and scheming. Plaintiff was elderly, unsophisticated in American business dealings, and not proficient in English. She was blind to her son's failings and willing to do anything to help him rehabilitate. In short, Plaintiff was an easy mark. The equity in Plaintiff's house was too tempting for Defendant to ignore. With Martin's help, Defendant introduced himself to Plaintiff and hit upon a scheme to separate her from her net worth. He did not care what happened to Plaintiff after the money was gone.

Doc. 5 at 157. But these findings and conclusions must have evidentiary support. Without such evidence, such findings and conclusions do not suffice because:

- Defendant's general quality of honesty or dishonesty is not a specific fraudulent action.

- Plaintiff's lack of sophistication, language skills, and presenting "an easy mark" does not establish Defendant's intent.

- Plaintiff's desire to help her son is not relevant to fraud on Defendant's part.

- The equity in Plaintiff's house being the source of money is a fact, but it does not demonstrate anything about Defendant's intent when Martin was the one who suggested the house as a source of money.

- Defendant's care or lack of care for Plaintiff after her money ran out does not establish his intent in creating a restaurant as a front to obtain Plaintiff's money.

In other words, the bankruptcy court's conclusions about Defendant's scheme were just that: conclusions. For such conclusions to have meaning, they must be, but were not, backed by evidentiary support.

And, although the bankruptcy court did cite some specific examples of fraudulent conduct, not all of this conduct is causally connected to the judgment debt to Plaintiff. For

instance, although it is true that an honest businessman would not have falsified corporate documents in an attempt to fraudulently obtain a liquor license, the bankruptcy court also recognized that obtaining a liquor license was essential to the success of the restaurant. Doc. 5 at 150. Thus, this fraud perpetrated on the state of Oregon does not appear to be part of a fraudulent scheme directed at Plaintiff. Other instances such as buying the boat amounts to less than $30,000 in fraud. Consequently, this misuse of funds is insufficient to support an overarching scheme to establish a restaurant as a front for obtaining additional funds from Plaintiff. After all, as the bankruptcy court observed, the restaurant was in operation for more than a year and earned at least some profits. Doc. 5 at 151. In short, the aggregation of the few specific instances of Defendant's (as opposed to Martin's) fraudulent conduct the bankruptcy court references does not establish an overarching scheme to use the restaurant as a front to obtain money from Plaintiff.

This Court must conduct a de novo review of the bankruptcy court's legal conclusions. Applying the factual findings the bankruptcy court set forth in its decision, I conclude that the bankruptcy court erred in holding that all of Defendant's judgment debt arose from actual fraud or false pretenses and, therefore, is nondischargeable. As such, I recommend that the Court remand this case for the bankruptcy court to determine, based on admissible evidence, which portion of the judgment arose from fraud or false pretenses that Defendant committed.

## II.    The Oregon state court complaint is not admissible for the truth of the matter asserted but Plaintiff's Oregon state court testimony is generally admissible for the truth of the matter asserted.

Defendant argues that neither the unsworn Oregon state court complaint nor Plaintiff's Oregon state court testimony is admissible for the truth of the matter asserted. Doc. 17 at 21-23. I agree with Defendant when it comes to the complaint, but not when it comes to Plaintiff's testimony.

Allegations in a complaint do not constitute evidence of the truth of the matter asserted. Thus, as Defendant argues, if the bankruptcy court did rely on the state court complaint and judgment for the truth of the matter asserted in those documents, such reliance would constitute error.[8]

Turning to Plaintiff's state court trial testimony, Defendant argues that Plaintiff's testimony from the Oregon case is inadmissible for several reasons. First, he asserts that he did not have the opportunity to confront Plaintiff during the state court trial because of circumstances that prevented him from attending the state court trial. Defendant did not timely present this argument in the proceedings below and so has waived it. Next, he complains that Plaintiff's counsel in the state court proceedings used leading questions to elicit Plaintiff's testimony, in violation of Federal Rule of Evidence 611(c). Defendant's leading question objections are untimely and cannot justify the exclusion of Plaintiff's testimony from evidence. Relatedly, Defendant argues that statements Plaintiff's counsel made while questioning Plaintiff do not constitute "testimony" from Plaintiff. I conclude that, to the extent Plaintiff adopted a statement her counsel made as part of a leading question, her counsel's statement should be considered part of her testimony. If Plaintiff's counsel made statements Plaintiff did not adopt during her testimony, however, Defendant is correct that such statements are not evidence. Finally,

---

[8] Neither party addresses whether an admission in the state court answer would render an allegation in the state court complaint admissible. To the extent Defendant admitted to allegations contained in the state court complaint, such admissions might be admissible. Doc. 3 at 25 (Defendant's Oregon state court answer). The record, however, does not indicate that the bankruptcy court relied on admissions to allegations in the state court complaint to form its factual findings.

Relatedly, although the bankruptcy court does appear to reference admissions in contained in the bankruptcy court answer, Doc. 5 at 153 (bankruptcy court opinion); Doc. 3 at 15 (Defendant's Answer to Complaint Objecting to Discharge of Debt), it does not indicate whether any admissions in that answer formed the basis for its factual findings.

Defendant argues that Plaintiff did not timely disclose her intent to use her state court testimony as evidence during the bankruptcy trial. Although it is true that Plaintiff's disclosure was late, this late disclosure occurred far in advance of the trial and so was harmless.

In sum, I find that, to the extent Plaintiff's counsel made statements during the state court trial that Plaintiff never adopted, such statements are inadmissible. Defendant's remaining challenges to the admission of Plaintiff's state court trial testimony, however, have no merit.

A.    Oregon complaint

At trial, Plaintiff moved to admit the Oregon complaint into evidence. Doc. 9 at 87. The bankruptcy court did not rule on this request during trial. Instead, in its May 11, 2023 opinion, it stated:

> The Court now rules that the complaint, answer, judgment and 2010 trial testimony (Plaintiff's only) will be admitted. Defendant is right that the complaint and answer were not on Plaintiff's exhibit list. Nevertheless, there is no question about the relevance and authenticity of those documents, which Defendant has had since the beginning of this proceeding and has argued about extensively.

Doc. 5 at 153 n.8. The bankruptcy court did not state, however, whether the complaint was admitted for the truth of the matters asserted in the complaint or as judicial notice of the fact of prior state court proceedings.

Defendant argues that the bankruptcy court erred by admitting the unsworn Oregon complaint as evidence for the truth of the matters asserted therein. Doc. 17 at 21. Defendant correctly points out that an unsworn complaint is hearsay and so may not be admitted for the truth of the matter. Doc. 17 at 21; *see* Fed. R. Evid. 801. Therefore, unless a hearsay exception

applies (and none has been offered), use of the complaint as evidence of the truth of the matters asserted therein would constitute error.[9] Plaintiff does not argue otherwise.

Instead, Plaintiff contends the state court complaint "was offered not to prove the truth of Plaintiff's allegations, but to establish what allegations Plaintiff made in the Oregon case." Doc. 18 at 12. Accepting this contention as true leads to the following question: If the bankruptcy court's factual findings were not based on allegations in the complaint, on what were they based? In the absence of citations to the record in those findings, this question is difficult to answer, and neither party supplies an answer.

In his motion for the bankruptcy court to reconsider its nondischargeability decision, Defendant did identify several factual findings he believed rested solely on allegations in the Oregon complaint: Defendant and Steve Martin buying a boat and a limousine with restaurant money and a loan in Plaintiff's name; and Defendant causing Plaintiff to buy 75% of Zamani Entertainment. Doc. 5 at 166. The bankruptcy court, in denying the motion, gave the basis in the trial record for the challenged findings. Doc. 5 at 178-80. On appeal, Defendant does not address, much less refute, the bankruptcy court's citations to the trial record for these points. The citations the bankruptcy court made in rejecting Defendant's motion for reconsideration, however, support only a portion of the factual findings the bankruptcy court made in its original § 523(a)(2)(A) decision where it found all of Defendant's judgment debt to be nondischargeable. That is, most of the bankruptcy court's factual findings contain no supporting citations to the record.

---

[9] Defendant also asserts that, "Many of the allegations in the Complaint are based on documentary evidence and *none* of the documentary exhibits from the Oregon case were evidence before the Bankruptcy Court." Doc. 17 at 22. To the extent the bankruptcy court's factual findings are based on documentary exhibits that were never admitted into evidence, this would also constitute error.

For her part, Plaintiff contends that, to the extent the bankruptcy court erred in admitting the complaint for the truth of the matter, such error was harmless because "the bankruptcy court's findings of fact were drawn in large part from Defendant's own testimony at [the bankruptcy] trial." Doc. 18 at 12. Plaintiff, however, does not supply the citations to the record for Defendant's own testimony that are missing from most of the bankruptcy court's findings.

Because I recommend remand for other reasons, the Court also need not attempt to divine the source of the bankruptcy court's factual findings or perform a harmless error analysis. Instead, to provide the bankruptcy court guidance in making factual findings on remand, I recommend that the Court hold that the Oregon state court complaint, standing alone,[10] is inadmissible for the truth of the matters asserted.

B.      Plaintiff's Oregon testimony

Defendant argues that the bankruptcy court erred in admitting the audio recording of Plaintiff's Oregon trial testimony. When a declarant is unavailable,[11] her testimony from another proceeding is admissible so long as it

> (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and
>
> (B) is now offered against a party who had--or, in a civil case, whose predecessor in interest had--an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

Fed. R. Evid. 804(b)(1).

---

[10] As noted above, Defendant's admissions to allegations in the state court complaint might be admissible.

[11] No party disputes that Plaintiff Taeki Martin was unavailable, initially as a result of dementia, and then because she passed away in 2022. Doc. 17 at 4 n.1.

Defendant does not argue before this Court that he lacked a motive to challenge this testimony in the Oregon trial. And a party's choice not to object or cross-examine the witness at the prior proceeding does not equate to the lack of opportunity to do so. *See* 2 McCormick on Evid. § 302 (8th ed.) ("Actual cross-examination is not required if the opportunity was afforded and waived. Whether cross-examination was conducted or waived, admissibility under this exception is not judged by the use made of the opportunity to cross-examine but rather the availability of the opportunity.").

Despite the testimony's facial eligibility under Rule 804, Defendant raises several challenges to it on appeal. First, Defendant argues that his failure to object should not be held against him because he was "unable to attend the Oregon trial due to Mr. Martin [Plaintiff's son]'s threats against him." Doc. 17 at 23. But he did not present this argument to the bankruptcy court. "Generally, an issue is waived if it was not raised below . . . ." *Xlear, Inc. v. Focus Nutrition, LLC*, 893 F.3d 1227, 1234 (10th Cir. 2018) (internal quotation marks and alterations omitted). The bankruptcy court ruled on the admissibility of the trial testimony in November 2021. Doc. 4 at 38. Defendant's brief submitted prior to the bankruptcy court's decision did not mention this argument. Doc. 4 at 10-19. Indeed, Plaintiff asserts that Defendant did not present the facts in support of this argument until trial on the merits in March 2023. Doc. 18 at 15. Defendant, for his part, does not point to any place in the record showing that he properly preserved this argument. There is no evidence Defendant presented this argument to the bankruptcy court prior to its ruling on admissibility, and Defendant does not point to any place in the record where he asked the bankruptcy court to reconsider its admissibility decision based on his testimony regarding the reasons he did not show up to the Oregon trial.

There are some circumstances under which a court may consider an issue raised for the first time on appeal. *E.g.*, *Ross v. U.S. Marshal for E. Dist. of Okla.*, 168 F.3d 1190, 1195 n.5 (10th Cir. 1999) (exercising discretion to resolve an issue that is "purely a matter of law" and "because its proper resolution is certain"). No such circumstances present themselves here. To resolve this matter on appeal, the Court would have to consider Plaintiff's argument that Defendant's assertion of threats is not credible. Doc. 18 at 15-16. This sort of credibility determination is unsuitable for resolution on appeal. It should be made by the bankruptcy court in the first instance, especially given that the bankruptcy court heard Defendant's testimony live. But Defendant's failure to timely present his unavailability-due-to-threat argument to the bankruptcy court prevented the bankruptcy court from assessing the credibility of Defendant's allegations. Thus, I recommend the Court find that Defendant has waived this argument and so decline to address this argument on appeal.

Defendant has also waived the next argument he makes: Plaintiff's testimony was not evidence because it consisted of "yes" or "no" answers to leading questions from Plaintiff's attorney. Defendant cites the Federal Rules of Evidence, Doc. 17 at 22, which state:

> (c) Leading questions. Leading questions should not
>
>  be used on direct examination except as necessary to develop a witness's testimony. Ordinarily, the court should allow leading questions
>
> > (1) on cross-examination; and
> >
> > (2) when a party calls a hostile witness, adverse party, or a witness identified with an adverse party.

Fed. R. Evid. 611(c)(1).

On its face, Rule 611(c) provides guidance about the form of trial testimony. Whether the state trial court, under state evidence rules, should have sustained objections to leading questions had Defendant made them is not a question this Court should consider. The time for Defendant

to object to leading questions asked during the state court trial was during the state court trial. That Defendant did not make such objections because he chose not to show up for his trial is no excuse, particularly given that Defendant has waived the coercion argument he now attempts to make. Moreover, to the extent Defendant wished to bring a post-state-trial challenge to the form of Plaintiff counsel's questions, that path was through a direct state court appeal (where, because Defendant made no objection during trial, the state appeals court likely would have reviewed Defendant's challenge under a harmless error standard of review). Further, even if the Court were inclined to consider Defendant's untimely challenge, Defendant does not address what standard should apply to the Court's review of the bankruptcy court's review of the state court's treatment of unobjected-to leading questions.

The question before this Court is whether Plaintiff's answers to leading questions constitute evidence admissible under Federal Rule of Evidence 804(b)(1). Defendant has provided no precedent in which an appellate court has overturned a lower court's decision to admit prior testimony under Rule 804(b)(1) because that prior testimony was elicited through leading questions. Defendant's only authority in support of his argument is that "attorney's statements are generally not considered evidence." Doc. 17 at 22 (citing *United States v. Ganadonegro*, 854 F. Supp.2d 1088, 1121 (D.N.M. 2012)). Although true, this truth does not bear on whether a witness's answers to attorney statements in leading questions are evidence. The focus should therefore be on whether Plaintiff herself gave answers to leading questions such that she adopted the statements as her own in testimony under oath. Accordingly, I recommend that the Court reject Defendant's argument that Plaintiff's state court testimony is inadmissible under Rule 804(b)(1) because it was the product of leading questions.

This leads to Defendant's third argument: Some of the evidence for the bankruptcy court's factual findings consists of questions or statements by counsel rather than testimony of Plaintiff at the state trial. Doc. 17 at 22-23; Doc. 19 at 10-11. In addressing this argument, the Court should distinguish between statements Plaintiff's Oregon counsel made that Plaintiff affirmed as part of her sworn testimony, and statements Plaintiff's Oregon counsel made that Plaintiff never affirmed. To the extent Plaintiff's Oregon counsel made a statement as part of a leading question that Plaintiff then affirmed during her testimony, for the reasons stated above, the Court should find such statements admissible.

Defendant argues, however, that Plaintiff did not adopt all of her counsel's statements. In his reply brief, Defendant gives the following an example of a factual finding the bankruptcy court based only on a statement by Plaintiff's counsel that Plaintiff did not adopt:

> For example, Plaintiff testified that she signed whatever documents Mr. Zamani gave her without reviewing them. [2-22-11 CD 11:36:30-37:08]. So, it made sense that when Plaintiff's counsel asked her about certain signatures, she did not remember signing. Yet, when Plaintiff expressed confusion regarding a certain signature during the Oregon trial, her counsel stated "That's why I am thinking its not your signature." [2-22-10 CD 11:18:13- 20]. [sic] The Bankruptcy Court specifically found that Mr. Zamani forged Plaintiff's signature, despite the lack of expert testimony or documentary evidence substantiating that finding [3 RP 568].

Doc. 19 at 10-11. As Defendant argues, statements of counsel, as opposed to answers from witnesses, do not qualify as evidence. Thus, relying on statements of counsel from the state trial to form the factual basis in the present case would constitute error. Because the bankruptcy court did not cite to the record in making its findings, however, the Court cannot determine whether the bankruptcy court did rely on unadopted statements Plaintiff's counsel made during the state trial.

Defendant attempts to account for this fact by pointing out that the bankruptcy court admitted the entire audio transcript of the Oregon trial into evidence (including unadopted

statements of Plaintiff's counsel) without distinguishing which portions of that transcript were admitted for the truth of the matter asserted and which were not. Defendant contends that "every bit of evidence admitted made a difference in the outcome of the [bankruptcy] trial." Doc. 19 at 12. This argument fails to recognize that most trials involve the introduction of some evidence that did not make a difference in the final verdict. Here, the parties have not addressed whether the admission of any particular piece of evidence, to include statements Plaintiff's counsel made that Plaintiff did not adopt, was harmless. Therefore, I do not recommend that the Court remand this case based on the wrongful admission of any one piece of evidence. Instead, I recommend the Court remand this case for other reasons, with instructions not to admit as evidence statements of counsel which Plaintiff did not adopt.

Finally, Defendant contends the bankruptcy court should have excluded the audio of the state court proceedings as a sanction under Federal Rule of Civil Procedure 37 due to Plaintiff's failure to timely disclose it as an exhibit. Defendant contends Plaintiff failed to timely notice her intent to use this exhibit at trial in accordance with the bankruptcy court's scheduling order. Doc. 17 at 24. Plaintiff asserts she did not timely disclose the audio because she thought the bankruptcy court would grant her motion for summary judgment based on issue preclusion and that such an order would obviate the need to present a record of the Oregon proceedings. Doc. 18 at 18. Defendant counters that, even after the bankruptcy court denied her motion for summary judgment, Plaintiff waited an additional six weeks to disclose her intent to use the audio exhibit. Doc. 17 at 24.

Defendant argues this prejudiced him because it "denied Mr. Zamani the opportunity to conduct his own fact finding and prepare evidence to rebut these materials." *Id.* Specifically, after trial Defendant prepared a declaration rebutting Plaintiff's audio testimony. *Id.*; *see* Doc. 5

at 171-72. The bankruptcy court refused to reconsider this evidence and so declined Defendant's request to alter its order based on Defendant's post-trial submission. Doc. 5 at 177-78. Defendant contends that, if he had received timely notice of Plaintiff's intent to seek the introduction of the entire record of the Oregon trial into evidence at the bankruptcy trial, he could have presented the evidence contained in his declaration during the bankruptcy trial. Doc. 17 at 24.

In response, Plaintiff does not dispute her disclosure was untimely. Instead, she argues Defendant did not suffer any prejudice from the late disclosure. Plaintiff explains that "the discovery at issue, the audio from the Oregon proceedings, was produced on September 13, 2021, and the matter was tried on March 2, 2023." Doc. 18 at 18. In other words, Defendant had more than a year and a half to prepare rebuttal evidence. Defendant does not address this contention in reply, or make any other arguments regarding prejudice.

Rule 37 calls for the exclusion of evidence not timely disclosed unless "the failure is substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). The bankruptcy court's ruling is subject to review for abuse of discretion. *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). I find no abuse of discretion in the ruling that the untimeliness was not prejudicial because Defendant still had ample time to prepare rebuttal evidence prior to trial. I recommend the Court affirm the admission of Plaintiff's Oregon testimony.[12]

---

[12] Defendant does not make any challenges to the admission of anything else in the Oregon state court record, so I recommend the Court decline to consider any.

**CONCLUSION**

For the above stated reasons, I recommend that the Court find:

1.      The bankruptcy court erred to the extent it relied on its own findings of non-fraudulent conduct to find that the entire amount of the debt was nondischargeable, because those findings were insufficient to establish the entire amount of the judgment debt arose from Defendant's fraud;

2.      The bankruptcy court erred to the extent it relied on the statement in the Oregon judgment to find causation between fraudulent conduct and the judgment debt;

3.      The Oregon complaint, standing alone, is inadmissible for the truth of the matters asserted therein;

4.      Plaintiff's Oregon state court trial testimony is admissible under Federal Rule of Evidence 804(b)(1);

5.      Unadopted statements Plaintiff's counsel made during the state trial are inadmissible; and

6.      The matter should be remanded to the bankruptcy court for further proceedings consistent with the Court's opinion and judgment.


_____
STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**